**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:18 CV 211**

| | | |
|---|---|---|
| **RED SQUARE PROPERTIES, LLC,** | ) | |
| a North Carolina Limited Liability | ) | |
| Company, | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **TOWN OF WAYNESVILLE, NORTH** | ) | |
| **CAROLINA**, a North Carolina municipality, | ) | |
| **and ELIZABETH TEAGUE** in her official | ) | |
| capacity, | ) | |
| | ) | |
| **Defendants.[1]** | ) | |
| _____ | ) | |

This matter is before the Court on Defendants' Motion to Dismiss (Doc. 24), which has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). Having carefully considered the arguments, the record, and applicable authority, the undersigned respectfully recommends that the Motion be granted.

## I.     Procedural Background

Plaintiff initiated this action on July 26, 2018, see (Doc. 1), asserting claims against the Town of Waynesville, North Carolina ("Town") and the Town's Development Services Director, Elizabeth Teague ("Teague"), both in her individual and official capacities.

The Town and Teague, in her official capacity, filed their Answer (Doc. 17) on August 30, 2018.

---

[1] The caption reflects the termination of the claims against Teague, in her individual capacity, on September 14, 2018. See (Doc. 21).

Plaintiff subsequently dismissed its claims against Teague in her individual capacity (Doc. 21).

On September 24, 2018, the parties filed a certification of initial attorneys' conference and discovery plan (Doc. 22). A Pretrial Order and Case Management Plan (Doc. 23) was entered the next day.

On October 12, 2018, Defendants filed the instant Motion to Dismiss (Doc. 24) and a supporting Memorandum of Law (Doc. 25). Plaintiff later filed a Memorandum in Opposition (Doc. 27), to which Defendants replied (Doc. 28).

## II. Factual Background

The material facts as alleged in Plaintiff's Complaint are as follows:

This case involves two houses - one located at 73 Hunters Crossing Ridge ("73 Hunters Crossing") and one located at 75 Hunters Crossing Ridge ("75 Hunters Crossing"). Compl. (Doc. 1) ¶ 8 (collectively "Houses"). Both Houses were built in 1995 and are located in a subdivision formerly known as Hunters Crossing Ridge. Id. ¶ 9. At all relevant times, the Houses have been outside the legal corporate limits of the Town but within one mile of the Town's limits and therefore in an area over which the Town exercises extraterritorial jurisdiction. Compl. (Doc. 1) ¶ 10. The Town enforces its zoning ordinances and its building and construction codes in this area. Id. ¶ 11.

In 2005, 73 Hunters Crossing was owned by Elaine Kuhl ("Kuhl") and 75 Hunters Crossing was owned by Jeff Coghill and his wife (the "Coghills"). Id. ¶ 12. Neither Kuhl nor the Coghills had any connection with Plaintiff. Id.

2

In 2005, a Town water line that served an unrelated house up the mountain from the Houses experienced a major leak involving "several hundred thousand gallons." Id. ¶ 13. The water damaged the foundations of the Houses. Id. The water line was shut down and will never be used again. Id.

The water leak also caused movement in the slope where the Houses are located, though "upon information and belief" once the leak stopped, the slope returned to a stable condition. Id. ¶ 14.

Following the damage from the water leak, Kuhl and the Coghills vacated the Houses. Id. ¶ 15. Additionally, after receiving "pessimistic engineering evaluations," and perhaps in order to have existing mortgage debt on the properties forgiven, the owners sought to have the Houses condemned by the Town. Id.

The owners' request was accommodated and, on September 27, 2006, the Town's Code Enforcement Official at the time, Jason R. Rogers ("Rogers"), held hearings regarding the condition of the Houses. Id. ¶ 16. Neither the Coghills nor Kuhl opposed the hearings and, according to the Town's records, no one attended the hearings, which both lasted ten minutes. Id.

In letters dated November 7, 2006, Rogers advised Kuhl and the Coghills that he was condemning the Houses. Id.

The Town sent a notice that the structures were unsafe and ordered Kuhl and the Coghills to demolish them on or before January 16, 2007. Id. ¶ 17.

These condemnation orders, however, were not recorded in the Office of the Register of Deeds for Haywood County. Id. ¶ 18. In addition, no notices of the orders, or any notices about the status of the properties, were posted at the Houses. Id. ¶ 19.

Subsequently, the Town took no further action and Kuhl and the Coghills took no action to demolish the Houses. Id. ¶ 20.

In 2007, Plaintiff purchased other homes directly across the street from 73 Hunters Crossing and 75 Hunters Crossing and used those other homes as short-term rentals. Id. ¶ 22.

In 2008, Plaintiff grew concerned about 73 Hunters Crossing and 75 Hunters Crossing because they were being vandalized and trespassers were parking in the driveway and entering the structures at night, which created concerns for Plaintiff's guests. Id. ¶ 23. Plaintiff requested that the Town take action to resolve the existing nuisance that was caused by the abandoned Houses, but the Town did not respond or act. Id. ¶¶ 24-25.

Attempts by Plaintiff to contact Kuhl and the Coghills and the lenders that held deeds of trust on the Houses were similarly unsuccessful. Id. ¶¶ 26-27.

Plaintiff then decided to address the issue itself by taking control of the Houses, and therefore requested that the Haywood County Tax Department ("Tax Department") foreclose on the Houses for unpaid real property taxes. Id. ¶¶ 28-29. The Tax Department agreed after Plaintiff gave assurances that the Tax Department's attorney's fees involved in the foreclosure would be covered by the bid. Id. ¶ 30.

A tax foreclosure sale occurred, and Plaintiff was the highest bidder, acquiring title to the Houses on April 20, 2016. Id. ¶¶ 31-32.

4

Plaintiff inspected the Houses and found that they were in surprisingly good condition. Id. ¶ 33. Plaintiff then proceeded to repair and renovate the Houses. Id. Plaintiff did most of the work itself and did not get a general building permit for much of the work, though Plaintiff did hire a licensed contractor to install new heating and air conditioning units, based on the belief that the contractor would obtain permits and have the work inspected. Id. ¶¶ 33-34.

The repair and renovation work commenced in the Spring of 2016 and was completed in about a year. Id. ¶ 35.

Around May of 2017, Plaintiff put the Houses into use as short-term rental properties. Id. ¶ 36.

On September 28, 2017, Plaintiff received a letter from a construction code enforcement official for the Town advising that the Town needed to "verify that the properties (73 and 75 Hunters Crossing Ridge) are in compliance with State and local fire and building safety codes." Id. ¶ 37.

Plaintiff hired an architect and engineers to respond to the Town and to satisfy all building code requirements. Id. ¶ 38. Plaintiff also agreed not to occupy the Houses until the building code requirements were satisfied. Id. ¶ 39.

In response, the Town threatened to cut water lines and order Duke Energy to cut electric power service to the Houses, and in October of 2017, power to the Houses was cut, and has not been restored, such that the Houses are unused. Id.

5

Plaintiff's structural engineer opined that the Houses were structurally sound, safe for occupancy, and not in imminent danger of failing. Plaintiff's geo-technical engineer concluded that the slope was stable and recommended continual monitoring. Id. ¶ 40.

In November 2017, Plaintiff met with Teague and the Town's construction code enforcement officials. Id. ¶ 41. The Town and Teague agreed that Plaintiff would apply for building permits and hire licensed contractors to do any work found to be necessary by the construction code officials. Id.

Following the November 2017 meeting, the Town's two construction code officials performed a detailed inspection of the Houses. Id. ¶ 42.

Around November 22, 2017, Plaintiff applied for building permits for the Houses. Id. ¶ 43. Plaintiff then waited for the Town to advise what work was necessary so that the building permits could be issued, and any required work could be done. Id.

On December 14, 2017, Teague advised Plaintiff via e-mail that "we will not be able to consider issuance of a building permit until we have a more exhaustive study and higher level of assurance from your team regarding the stability of the site." Id. ¶ 44.

Plaintiff believes that Teague oversaw the construction code officials and instructed them not to issue any building permits and not to disclose the results of their inspections to deprive Plaintiff of the use of its properties. Id. Teague made representations that she had conferred with "our State Department of Insurance" and that it agreed with her position. Id.

6

On an unspecified date, Plaintiff secured from a licensed engineering firm a proposal for monitoring slope stability over a five-year term.  Id. ¶ 45.  Plaintiff advised Defendants of the monitoring plan.  Id.

On April 25, 2018, the Town's attorney informed Plaintiff's architect that Plaintiff must "either provide a plan to address the issues leading to the condemnation, specifically proposing how the slope and soil will be stabilized, or proceed with demolition and removal of the structures."  Id. ¶ 46.

In response, Plaintiff submitted its monitoring plan to the Town and asked that the building permits be issued.  Id. ¶ 47.

On June 18, 2018, the Town advised Plaintiff that "until such time as the building inspection department receives a sealed report from a qualified professional that the slope is stable, it is unable to approve any application for that location."  Id.

## III.  Legal Standards

As noted, Defendants answered the Complaint and subsequently filed the instant Motion to Dismiss.[2]  To the extent the Motion is made pursuant to Rule 12(b)(1), the Motion is timely.  See Fed. R. Civ. P. 12(h)(3).  To the extent the Motion is made pursuant to Rule 12(b)(6), the undersigned will construe it to be a motion for judgment on the pleadings under Rule 12(c). See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).

---

[2]  LCvR 7.1(c)(1) allows a party to include a motion to dismiss in its answer for preservation purposes and subsequently seek a decision on the motion by filing a separate motion and supporting brief.  Defendants' Answer included several of the issues raised by the instant Motion, but they were styled as affirmative defenses.

7

## A.    Fed. R. Civ. P. 12(b)(1)

A motion to dismiss filed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure raises the question of whether the court has subject matter jurisdiction to hear the dispute. Where a defendant contends that a complaint fails to allege facts upon which the court can base subject matter jurisdiction, the court, as when ruling on a motion to dismiss pursuant to Rule 12(b)(6), assumes as true the factual allegations in the complaint. See Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

The burden of establishing subject matter jurisdiction rests with the party asserting jurisdiction. Id.; Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995). "[D]ismissal for lack of subject matter jurisdiction should normally be without prejudice, since by definition the court lacks power to reach the merits of the case." Beckworth v. Bizier, No. 3:12-CV-00512-MOC-DSC, 2013 WL 310065, at *1 n.1 (W.D.N.C. Jan. 25, 2013).

## B.    Fed. R. Civ. P. 12(b)(6) and 12(c)

The standard applied to motions made pursuant to Rule 12(c) is the same as for motions made under Rule 12(b)(6). See Edwards, 178 F.3d at 243.

In a motion made pursuant to Rule 12(b)(6), the central issue is whether the complaint states a plausible claim for relief. See Francis v. Giacomelli, 588 F.3d 186, 189 (4th Cir. 2009). In that context, the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Giacomelli, 588 F.3d at 192. The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com,

591 F.3d at 255; see Giacomelli, 588 F.3d at 192.

The complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; accord Consumeraffairs.com, 591 F.3d at 255. The mere possibility that a defendant acted unlawfully is not enough for a claim to survive a motion to dismiss. Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193. Ultimately, the well-pled factual allegations must move a plaintiff's claim from possible to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## IV.   Discussion

Plaintiff's Complaint contains six (6) claims: 1) inverse condemnation; 2) abuse of process; 3) unlawful taking under the Fifth Amendment to the United States Constitution; 4) unlawful taking under the Fourteenth Amendment to the United States Constitution; 5) unlawful taking under Article I, Section 19 of the North Carolina Constitution; and 6) a request for injunctive relief.

Plaintiff's claims against Teague in her official capacity are equivalent to claims against the Town itself.  See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).

### A.   Federal Claims

Plaintiff's first claim, for inverse condemnation, alleges that Defendants "acted at all times under color and authority of state and municipal law," Compl. ¶ 62, and that Defendants have "deprived Plaintiff of property without compensation in violation of 42

9

U.S.C. § 1983." Compl. ¶ 57. The undersigned will consider this claim to be an inverse condemnation claim made under federal law.

Plaintiff's third claim is entitled "Unlawful Taking under the Fifth Amendment of the Constitution of the United States." Plaintiff's fourth claim is entitled "Unlawful Taking under the Fourteenth Amendment of the Constitution of the United States." The undersigned will construe these claims together as being a claim alleging violation of the Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment. See Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001) (citing Chicago, Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897)).

### 1. Ripeness

Federal courts adjudicate "cases" or "controversies." U.S. Const. Art. III, § 2. "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in a 'clean-cut and concrete form.'" Miller v. Brown, 462 F.3d 312, 318-19 (4th Cir. 2006). "Ripeness challenges implicate Article III limitations and prudential considerations and may be properly raised in a Rule 12(b)(1) motion." Fresenius Med. Care Holdings, Inc. v. Town of Lillington, 339 F. Supp. 3d 557, 561 (E.D.N.C. 2018) (internal citations omitted).

"A takings claim is not ripe for adjudication in federal court unless the plaintiff has obtained a final administrative decision regarding the application of the challenged regulations to the property, and has sought and been denied just compensation through the available and adequate state remedies." Carspa Automotive, LLC v. City of Raleigh, 57

F. Supp. 3d 505, 506 (E.D.N.C. 2014) (citing <u>Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. 172, 195 (1985)).

These two concepts were addressed by the Supreme Court in <u>Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. 172 (1985), where the owner of a tract of land alleged that the application of a county's zoning laws and regulations affecting the property amounted to a taking. <u>Id.</u> at 175. As to the finality requirement, the Court explained:

> As the Court has made clear in several recent decisions, a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.

<u>Id.</u> at 186. The owner's claim did not satisfy this standard. <u>Id.</u> at 186-194.

The Supreme Court also found that the takings claim was not ripe because the "respondent did not seek compensation through the procedures the State ha[d] provided for doing so." <u>Id.</u> at 194.[3]

---

[3] Currently pending before the Supreme Court is <u>Knick v. Township of Scott, Pa.</u>, (Docket No. 17-647), a case in which the state – litigation requirement is under review. The issue of finality, however, has not been raised by the petitioner in that matter. <u>Id.</u> Pet'r's Br. at 10. ("It is generally true, of course, that one may not hold the government accountable for a taking until the issue is ripe for a conclusive determination. <u>Palazzolo</u>, 533 U.S. at 618. Prior to the decision in <u>Williamson County</u>, this ripeness requirement meant that an owner could not claim a taking until the challenged government action causes a clear and final injury to property. <u>San Remo Hotel, L.P. v. City & County of San Francisco</u>, 545 U.S. 323, 346-47 (2005). This traditional 'finality' ripeness regime is not challenged here.")

### a. Final Decision

"[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury[.]" Williamson County, 473 U.S. at 192-93.

In this case, the parties disagree as to what should be considered "the issue" for purposes of this analysis. Plaintiff argues that the issue is not Defendants' denial of Plaintiff's applications for building permits on their merits, but rather Defendants' decision to require Plaintiff to produce information on slope stability before Plaintiff's applications are considered. Pl.'s Mem. (Doc. 27) at 1-2, 10.

Defendants focus on the issuance of a building permit itself. They acknowledge having decided that Plaintiff's "application was incomplete because of the failure to include a study of the slope's stability where the slide occurred" but argue "there has been no initial decision in this case to deny a building permit upon which a § 1983 claim can be based." Defs.' Mem. (Doc. 25) at 13-14 (emphasis in original).

"A case is fit for adjudication 'when the action in controversy is final and not dependent on future uncertainties.' Stated alternatively, '[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 270 (4th Cir. 2013) (citations omitted).

Here, Defendants have required information about slope stability in advance of addressing Plaintiff's permit applications. Plaintiff argues the Town may not require Plaintiff to produce such information, but N.C.G.S. § 160A-193 provides a city with the

"authority to summarily remove, abate, or remedy everything in the city limits, or within one mile thereof, that is dangerous or prejudicial to the public health or public safety." The Town's concerns in this regard are reasonable given the history of the site where the Houses are located, a history that includes the release of "several hundred thousand gallons" of water which damaged the foundations of the Houses and led to the prior owners' "pessimistic engineering evaluations" and the condemnation of the Houses themselves.

Further, though the exercise of the Town's powers under N.C.G.S. § 160A-193 may be distinct from the Town's consideration of Plaintiff's applications for building permits, these components are part of the overall process of reviewing the fitness and safety of the Houses. See Franks v. Ross, 313 F.3d 184, 195 (4th Cir. 2002) (where participation by county and state were parts of single permitting process, claim was not ripe until completion of the final step of the process).

That process is not yet complete, as Plaintiff has not provided the information requested by the Town. After a construction code enforcement official, in September 2017, sought to verify that the Houses were in compliance with fire and building safety codes, Plaintiff engaged an architect, a structural engineer, and a geo-technical engineer to work on any code issues. Plaintiff's geo-technical engineer concluded the slope was stable and recommended continual monitoring. The Complaint, however, does not indicate that this conclusion was communicated to the Town at that time.

Around November 22, 2017, Plaintiff applied for building permits and waited for the Town to advise what work was needed. The Town did not respond with a list of issues however and, instead, on December 14, 2017, advised that "we will not be able to consider

13

issuance of a building permit until we have a more exhaustive study and higher level of assurance from your team regarding the stability of the site."

Plaintiff alleges that it subsequently obtained, from a licensed engineering firm, a proposal for slope stability monitoring over a five-year period. The Complaint appears to indicate, however, that Defendants were informed only of the existence of the monitoring plan at that time.

On April 25, 2018, the Town, through counsel, advised that Plaintiff must either provide a plan to address the issues leading to the condemnation and specifically propose how the slope and soil would be stabilized, or proceed with demolition. Plaintiff then provided the slope monitoring plan itself to the Town. However, the Town had requested a plan to address the issues that led to the condemnation and a proposal of how the slope and soil would be stabilized, not a "monitoring" plan.

Consequently, the Town responded in June 2018 that until the building inspection department received a sealed report from a qualified professional that the slope was stable, it would not approve any application for that location.

The Complaint does not allege that Plaintiff responded to this statement. In addition, Plaintiff's allegations do not demonstrate that its previous response satisfied these conditions; even if the "licensed engineering firm" that created the monitoring plan is considered to be a qualified professional for purposes of slope stability analysis, Plaintiff

does not allege that the monitoring plan was a sealed report showing that the slope was or could be made stable.[4]

In sum, the Town has not reached "a final decision regarding the application of the regulations" and, therefore, Plaintiff's federal inverse condemnation and takings claims are not ripe.[5]

### b. Use of Available State Procedures

As noted, Williamson County included a second basis for ripeness consideration: "For a takings claim against a state or its political subdivisions to be ripe in federal court, the plaintiff must first have sought compensation 'through the procedures the State has provided for doing so.'" Sansotta v. Town of Nags Head, 724 F.3d 533, 544 (4th Cir. 2013) (quoting Williamson County, 473 U.S. at 172).

The Fourth Circuit has held that, "[a]lthough '[r]ipeness reflects constitutional considerations that implicate 'Article III limitations on judicial power,' as well as 'prudential reasons for refusing to exercise jurisdiction,' the Williamson County state-litigation requirement involves only prudential considerations[.]" Id. at 545. Since it is a

---

[4] In its brief, Plaintiff states that it "has provided sealed reports from both its architect and structural engineer that the structures are safe for occupancy." Pl.'s Mem. (Doc. 27) at 10 (emphasis added). This specific allegation does not appear in the Complaint. Further, no mention is made of a sealed report being provided on the issue of slope stability.

[5] The status of the Houses themselves, apart from the stability of the slope, is also unclear. Plaintiff has alleged that the Houses are structurally sound, and that Plaintiff's work brought them into "substantial compliance" with the applicable construction codes. Compl. ¶¶ 40, 55. Plaintiff has not, however, alleged that the Houses need no further work. To the contrary, Plaintiff was waiting for the Town to advise what issues it had identified during the inspection of the Houses and was planning to address them, which indicates that additional work may yet be needed.

prudential rather than a jurisdictional rule, courts may determine that it should not apply in some instances.  Id. (citing Washlefske v. Winston, 234 F.3d 179, 182 (4th Cir. 2000)).[6]

Circumstances warranting an exception to the prudential ripeness rule of Williamson County are not present in the instant matter. See Sansotta, 724 F.3d at 543 (town waived the state-litigation requirement by removing case to federal court); Town of Nags Head v. Toloczko, 728 F.3d 391, 399 (4th Cir. 2013) (though waiver principle of Sansotta did not apply where plaintiff removed regulatory takings claim to federal court before a North Carolina court could grant or deny a correlative state-law remedy, case was considered in the interests of fairness and judicial economy and to prevent piecemeal litigation or otherwise unfair procedures).  Plaintiff did not file its claim in state court only to have it removed to federal court, but rather chose to begin the case in a federal forum. See Camden Cty. v. N.E. Cmty. Dev. Corp., 263 F. Supp. 3d 556, 562 (E.D.N.C. 2017) ("A claimant who is in federal court because of his own litigation strategy and who has not yet sought a claim for compensation under state law in state court usually cannot proceed on a Takings Clause claim[.]").

North Carolina law provides a procedure through which a property owner whose property has been taken by an act or omission of a local government may file an action for compensation.  N.C. Gen. Stat. § 40A-51; see CarSpa, 57 F. Supp. 3d at 507; Robertson v. City of High Point, 497 S.E.2d 300, 303 (N.C. Ct. App. 1998) (recognizing that N.C. Gen.

---

[6] As noted above, this requirement from Williamson County is under review in Knick v. Township of Scott, P.A., (Docket No. 17-647). Currently, however, Williamson County remains valid.

16

Stat. § 40A-51 is an adequate state remedy for the total or partial taking of real property interests).

Plaintiff does not dispute that it has not sought redress under North Carolina's inverse condemnation statute but instead argues that an action under N.C. Gen. Stat. § 40A-51 is only available for specific takings listed in N.C. Gen. Stat. § 40A-3(b) and (c) that are not involved here. Pl.'s Mem. (Doc. 27) at 8-9. Defendants point out, though, that the North Carolina Supreme Court has held as follows:

> [W]e conclude that the references to N.C.G.S. § 40A-3(b) and (c) contained in N.C.G.S. § 40A-51 serve to simply delineate the universe of entities against whom a statutory inverse condemnation can be brought pursuant to N.C.G.S. § 40A-51 rather than limiting the acts or omissions that must be shown in order to permit the maintenance of the statutory inverse condemnation action authorized in N.C.G.S. § 40A-51.

Wilkie v. City of Boiling Spring Lakes, 370 N.C. 540, 546–47, 809 S.E.2d 853, 858 (2018).

Consequently, Plaintiff's federal inverse condemnation and takings claims are likewise unripe in view of the state - litigation requirement.

## 2. Failure to State a Claim

Defendants argue, in the alternative, that Plaintiff's federal claims may also be dismissed on the merits. Defs.' Mem. (Doc. 25) at 14-16. However, in light of the recommended dismissal of Plaintiff's claims on ripeness grounds, it is not necessary to reach this argument.

17

### B. State Law Claims

Defendants argue that this Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims for abuse of process and violation of Article I, Section 19 of the North Carolina Constitution. Defs.' Mem. (Doc. 25) at 18-19.

Pursuant to 28 U.S.C. § 1367(c), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction."

In the instant case, Plaintiff's federal claims create the basis for federal jurisdiction over this action. If these claims are dismissed as recommended, that basis will be gone. Further, Plaintiff's state law claims do not involve underlying issues of federal policy. Consequently, the undersigned will recommend that supplemental jurisdiction over Plaintiff's state law claims be declined and that those claims be dismissed without prejudice.

### C. Injunctive Relief

Plaintiff's final claim requests that Defendants "be preliminarily and permanently enjoined from taking any action under color of state and/or municipal law to have the houses demolished or cause them to be demolished." Compl. ¶ 87.

"In order to obtain a preliminary injunction, a plaintiff must establish all four of the following elements: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in plaintiff's favor; and (4) that an injunction is in the public interest." Moore

v. Corpening, No. 1:18-CV-00146-FDW, 2018 WL 4110547, at \*13 (W.D.N.C. Aug. 29, 2018) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

Because Plaintiff's underlying claims should be dismissed as discussed above, Plaintiff cannot satisfy these elements. The undersigned will therefore recommend that Plaintiff's request for injunctive relief similarly be dismissed without prejudice.

## V.     Recommendations

The undersigned **RECOMMENDS** that Defendants' Motion to Dismiss (Doc. 24) be **GRANTED**, and:

1.  That Plaintiff's first, third, and fourth claims be **DISMISSED WITHOUT PREJUDICE** on ripeness grounds;

2.  That the Court decline to exercise supplemental jurisdiction over Plaintiff's second and fifth claims and that said claims be **DISMISSED WITHOUT PREJUDICE**; and

3.  That Plaintiff's sixth claim be **DISMISSED WITHOUT PREJUDICE**.

Signed: May 22, 2019

W. Carleton Metcalf
United States Magistrate Judge

19

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same.  **Responses to the objections must be filed within fourteen (14) days of service of the objections.**  Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140, 140 (1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).